SIGNED THIS: August 14, 2020

_____
**Thomas L. Perkins
United States Chief Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| ANTHONY D. BROOKS and | ) | Case No. 18-80311 |
| AMY J. BROOKS, | ) | |
| Debtors. | ) | |
| | ) | |
| ANTHONY D. BROOKS and | ) | |
| AMY J. BROOKS, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Adv. No. 19-08072 |
| | ) | |
| STRATEGIC FUNDING SOURCE, INC. and | ) | |
| FIRST MIDWEST BANK, | ) | |
| Defendants. | ) | |

**OPINION**

This matter is before the Court after trial on Count III of the complaint filed by Anthony D. Brooks and Amy J. Brooks, the Debtors, against Strategic Funding Source, Inc. (Strategic) and First Midwest Bank (FMB), and the First Crossclaim asserted by Strategic against FMB. A settlement agreement entered into by the Debtors and Strategic, resolving most of the disputes between them, was incorporated into a Chapter 11 plan which has been confirmed. The only

remaining issue between the parties to this proceeding involves the competing claims of Strategic and FMB to the balance of the 2018 grain proceeds in the approximate amount of $235,000 held by the Debtors in a Debtor-in-Possession account.

## BACKGROUND

The Debtors, engaged in farming since 2000, reside with their young daughter in Avon, Illinois, where their homestead and farmstead are located. In addition, the Debtors own approximately forty acres of livestock pasture land with a small rental house in nearby Berwick. The Debtors operate a corn and soybean farming business as a sole proprietorship, doing business as Brooks Farm, renting as much as 4,000 acres in some years. Beginning in 2012, the Debtors financed their farming operation through a series of loans with FMB. The loans were secured pursuant to a security agreement dated July 16, 2012, which granted FMB a lien on substantially all of their assets, as well as by mortgages on their real estate. In July 2012, the Debtors borrowed $2,800,000 from FMB. FMB perfected its security interest by filing a financing statement on August 2, 2012.

The Debtors encountered financial difficulties in 2013, which led to additional borrowing from FMB in subsequent years, placing the Debtors in a highly leveraged position. In December 2015, while awaiting FMB's restructuring of their loans, Anthony, with the encouragement of his FMB loan officer, Adam Stonecipher, sought another source of funding for the 2016 crop inputs, in order to qualify for cash discounts offered by input vendors.

On December 29, 2015, Anthony executed a Revenue Based Factoring Agreement with Strategic, a New York company engaged in the business of paying merchants cash for future receivables. Under the Factoring Agreement, the Debtors sold and Strategic purchased all of the Debtors' "future receipts, accounts, contract rights and other obligations arising from or relating to the payment of moneys" from the Debtors' customers, until such time as the "Receipts Purchased Amount," designated to be the sum of $236,250, was paid in full by the Debtors to Strategic. The Receipts Purchased Amount was to be paid over a one-year term, by ACH debit from a bank account designated by the Debtors in 26 bi-weekly payments of $9,086, in exchange for which the Debtors were to receive an immediate cash payment from Strategic in the amount of $175,000.

The Debtors designated their operating account at FMB as the account from which the ACH payments to Strategic were to be debited. The account statements for this account, called a

Solutions Checking account, reveal a large amount of activity. In January 2016, the account had over $580,000 in deposits and $616,000 in debits, with an average balance of $57,000. In February, deposits of $205,000 were made against $198,000 of debits, with an average balance of $34,000. In March, deposits of $1,315,000 were made with debits of $1,316,000, and an average balance of $55,000. In April, $626,000 in deposits were made and $572,000 in debits, with an average balance of $94,000.

In connection with the transaction, Anthony executed a related Security Agreement and Guaranty granting Strategic a security interest in all accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory, including after-acquired property and all proceeds.  On January 11, 2016, after deducting $1,205 for certain transaction fees, Strategic caused the cash proceeds under the Factoring Agreement of $173,795 to be deposited into the Debtors' operating account at FMB by wire transfer.  Strategic perfected its security interest by filing a UCC financing statement on January 12, 2016.

The Debtors' loans with FMB were restructured in early March 2016.  Those loans, totaling $7,079,165, included a line of credit in the amount of $2,250,000; the 2015 grain inventory note with a balance of $1,916,182; the 2015 carryover single pay note at $822,733; the Ag equipment note at $1,268,650; and real estate mortgages at $821,600. In so doing, however, FMB viewed the loans with concern, given the significant amount of debt owed by the Debtors. As a special condition of the restructured loans, FMB required copies of receipts/bills for bank controlled draws from the 2016 line of credit to reconcile with 2016 cash flow projections.

Instead of bi-weekly debits, weekly ACH debits of $4,543 began on January 19, 2016, and continued to be made to Strategic, on a regular basis.  In mid-April 2016, however, the ACH debit of $4,543 to Strategic would have resulted in an overdraft of $2,210.33, and thus required special approval by FMB.  Following a communication between Mr. Stonecipher and Douglas Slaton, FMB's Vice President, regarding the negative account balance, the ACH payment was not made.  Mr. Stonecipher advised Slaton that he was not aware of any business the Debtors had with Strategic and that he would inquire of Anthony.  That same day, while responding to a request from Amy Brooks for a transfer of funds to cover certain itemized expenses, Stonecipher advised her that he noticed the Strategic transaction and requested information concerning it, asking whether it should be covered with an advance from the line of credit. She did not answer his inquiry.

On May 17, 2016, Anthony suffered severe injuries when a bull ran over him, breaking his back and pelvis. After spending forty-five days in the hospital, he recovered at home, remaining bed-bound until early to mid-August. At some point while he was recuperating at home, Stonecipher made a farm visit. The date of the visit and the substance of what was discussed is not part of the evidentiary record.

A "Stop Payment" order, bearing a stamped date of August 2, 2016, was placed by FMB on the Debtors' account which halted the ACH debits to Strategic. Mr. Stonecipher denied initiating the order or knowing who did so, although typically an order to stop an ongoing ACH debit is made at the direction of the account holder, according to his testimony. At that point in time, Strategic had been paid $94,028 via ACH debits. By its terms, the Stop Payment would expire on February 1, 2017. Following the Stop Payment order, the Debtors continued to make payments on their own, totaling $17,000, to Strategic by wire transfer. Nonetheless, Strategic declared a default and on October 7, 2016, brought suit against Anthony and Brooks Farm in New York state court, alleging breach of contract, account stated, and breach of guaranty against Anthony. A default judgment was entered against Anthony and Brooks Farms in the amount of $140,074.48.

The Debtors filed a Chapter 11 petition on March 9, 2018. At the time the case was filed, the Debtors' assets included harvested corn valued at $985,500, cattle valued at $101,000 and farm equipment and machinery valued at $583,550. Strategic was listed on Schedule F as holding an unsecured claim for $125,500. FMB filed a claim for $4,941,389.11, representing the combined amounts due on its loans. Eventually, the Debtors ceased managing their own farming business after the filing of the petition, employing Middle Ground Farms, LLC, as sales consultant and embarking on a plan to liquidate certain assets including grain equipment and cattle livestock in order to pay down secured creditors and reorganize their scaled-down farming operation. During the pendency of the proceedings, FMB received interim distributions of $750,000 in September 2018, $194,157.75 (equipment proceeds) on November 14, 2018 and $60,000 on December 21, 2018. With the making of the third distribution, the Debtors retained approximately $400,000 to cover any remaining expenses.

Strategic did not participate in the proceedings until February 28, 2019, after the law firm which had earlier entered its appearance on behalf of Strategic, made a switch in the attorneys handling the case. On that date, a hearing was held on the Debtors' emergency motion for

4

authority to obtain credit for crop financing for 2019. At that hearing, Strategic first raised with the Court the assertion of an ownership interest, rather than a security interest, in the Debtors' future business receivables, a position which the Debtors strenuously opposed. An agreed order entered on March 4, 2019, authorized the financing on an interim basis, reserving the issue of the respective rights and priorities of FMB and Strategic in the remaining proceeds from the sale of the Debtors' assets.

The Debtors filed their disclosure statement and plan on May 13, 2019. Strategic objected to the plan on the basis that it failed to protect its ownership interest in the Debtors' future receivables. On Oct. 11, 2019, after the filing of an amended disclosure statement and plan, the Debtors filed a motion for approval of a compromise reached with Strategic, which was eventually granted on Dec. 9, 2019. FMB's objection to confirmation was ultimately resolved and the third amended plan was confirmed on June 9, 2020. Under the terms of the confirmed plan, which was agreed to by Strategic, the Debtors are obligated to make a new value contribution in the amount of $100,000 allocated to the payment of certain allowed claims. Strategic has an allowed claim in the amount of $144,288.22 to be paid from one or both of two designated sources: (1) the 2018 grain proceeds that are the subject of this adversary proceeding, subject to the judgment of this Court, and (2) up to $25,000 from the new value contribution. Strategic waived all other payment rights. If Strategic prevails in this adversary proceeding, its allowed claim will be paid in full out of the 2018 grain proceeds. If FMB prevails, Strategic will receive a $25,000 payment and nothing more.

This adversary proceeding was filed by the Debtors on August 27, 2019, challenging Strategic's claim of an ownership interest in the Debtors' current and future farming receivables and seeking to determine the respective interests of Strategic and FMB in the remaining grain sale proceeds. Strategic filed an answer disputing the Debtors' claims, asserting counterclaims against Anthony and crossclaims against FMB. Both the stipulation entered by Strategic, fixing the amount of its allowed claim and allotting it a portion of the Debtors' new value contribution, as well as the plan modifications made to the treatment of FMB's claims resolving its objection to confirmation of the plan, significantly narrowed the issues. An agreed order dismissing Counts I and II of the Complaint and Strategic's counterclaims against Anthony was entered on Dec. 30, 2019. Both the second and the third crossclaims alleged by Strategic were also subsequently dismissed by order entered January 24, 2020. Left to be decided was Count III of

5

the Complaint concerning the determination of the respective interests of FMB and Strategic with regard to the remaining grain sale proceeds and the First Amended Crossclaim asserted by Strategic against FMB pursuant to section 510(c)(1), requesting the remedy of equitable subordination.

A trial was held on those issues on June 23, 2020. David Wolfson, the Vice President of Strategic's Risk Management and Asset Recovery Department, testified for Strategic. Adam Stonecipher, who had been employed by FMB from October 2012, until October 2019, and was acting as Vice President of Agricultural Lending during the relevant time period, testified on behalf of FMB. Anthony, called as a witness by Strategic, also testified at the trial.

## ANALYSIS

**U.C.C. §9-315(a)(1)**

The parties agree that the primary issue before the Court is whether FMB's security interest in crops and proceeds was terminated on account of the Factoring Agreement between the Debtors and Strategic. The parties agree that the issue is governed by Section 9-315(a) of the Illinois Uniform Commercial Code, which provides as follows:

> (a) Disposition of collateral: continuation of security interest or agricultural lien; proceeds. Except as otherwise provided in this Article and in Section 2-403(2):
>> (1) a security interest or agricultural lien continues in collateral notwithstanding sale, lease, license, exchange, or other disposition thereof unless the secured party authorized the disposition free of the security interest or agricultural lien; and
>> (2) a security interest attaches to any identifiable proceeds of collateral.

810 ILCS 5/9-315.

Section 9-315, effective July 1, 2001, represented a departure from section 9-306(2), the provision's predecessor. That section provided:

> (2) Except where this Article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.

6

Ill. Rev. Stat. Ch. 26, par. 9-306(a)(2).  Speaking to the difference, the court in *In re Jersey Tractor Trailer Training Inc.*, 580 F.3d 147, 154 (3d Cir. 2009), noted:

> The two sections differ in one material respect.  Former §9-306(2) stated that "a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof, *unless the disposition was authorized* by the secured party in the security agreement or otherwise …" (emphasis added), while revised §9-315(a)(1) states: "a security interest … continues in collateral notwithstanding sale, lease, license, exchange, or other disposition thereof *unless the secured party authorized the disposition free of the security interest*…." (emphasis added).

Thus, under section 9-315, a secured party only forfeits its security interest in collateral pursuant to this provision when collateral is authorized by the secured creditor to be transferred free and clear of that party's security interest. *In re Schley*, 509 B.R. 901 (Bankr. N.D. Ia. 2014); *In re Montagne*, 417 B.R. 214 (Bankr. D. Vt. 2009); *Peoples Trust & Sav. Bank v. Sec. Sav. Bank*, 815 N.W. 2d 744 (Iowa 2012) (waiver of rights in collateral does not necessarily mean waiver of the rights in the proceeds, unless the secured party actually and knowingly waives that right to proceeds). According to the Uniform Commercial Code Comment, the language of §9-315(a)(1) "makes explicit that the authorized disposition to which it refers is an authorized disposition 'free of' the security interest or agricultural lien." 810 ILCS 5/9-315, UCC Comment 2.  The lack of a written consent is not conclusive, however, as a creditor's authorization may be expressed verbally or may be implied from its actions or course of dealing.  But acts of "[i]mplied authorization . . . must unequivocally demonstrate an intent to waive the security interest." Lary Lawrence, 11 *Anderson U.C.C.* §9-315:9 [Rev] at 439 (2007). Neither inaction nor mere acquiescence alone can support a finding of implied authorization. *Jersey Tractor,* 580 F.3d at 155 (secured party's failure to stop debtor's ongoing sales of accounts receivable was mere inaction that did not unequivocally demonstrate an intent to waive the security interest).

Strategic contends that FMB, acting through Adam Stonecipher, impliedly authorized the sale of the Debtors' farm receivables to Strategic, free and clear of its liens.  Absent evidence of an express authorization, either written or verbal, of which there is none, Strategic is left to attempt to establish that FMB impliedly authorized the sale to Strategic free and clear of FMB's security interest.  Strategic maintains that FMB's refusal to finance the 2016 crop inputs, forcing the Debtors to turn elsewhere, its awareness of the sale to Strategic, coupled with its acquiescence in the use of the operating account for the debited payments, amounted to an implied authorization of the sale free and clear of its lien.

7

In this Court's view, the evidence falls well short of establishing that FMB knowingly consented to the sale of its collateral to Strategic, much less free of its security interest. Although the signed Agreement that Anthony submitted to Strategic initiating this transaction represented that the Debtors' future receivables were being sold free and clear of any security interest, the evidence indicates that FMB was not provided a copy of the agreement and was not otherwise made aware of that contract term. Mr. Wolfson acknowledged that Strategic's search for UCC-1 filings disclosed FMB's perfected security interest. Strategic knew of FMB's prior interest before it funded the Debtors, but the evidence establishes that FMB was not aware of Strategic's purchase of farm receipts as a condition of its financing.

Mr. Stonecipher, whom the Court found to be a credible witness, admitted telling Anthony that he should explore another source of financing for 2016 crop inputs because FMB's review of the Debtors' request for restructuring of their loans would not be completed in time for them to obtain the cash discounts which were a crucial element for the profitability of the coming year. Anthony testified that he informed Stonecipher in December 2015 that he had found a source of input funding, that the new lender would want to speak with him before the loan could go forward, and that Stonecipher agreed to do so. Mr. Stonecipher remembered receiving a single telephone call for what he recalled to be a character reference request for Anthony that could have been from Strategic, though he did not remember specific details of the conversation. He testified that he assumed that the Debtors had obtained inputs on unsecured credit, as is not uncommon in farming. Mr. Stonecipher stated that he did not receive a copy of the Factoring Agreement or any related documents from the Debtor or Strategic.

Mr. Stonecipher testified that he did not recall receiving a request from anyone for copies of the Brooks' loan documents and he never provided copies to anyone. FMB's records, however, substantiate brief communications occurred between Lee Sieradzky and Jana Henk, an Assistant Vice President for Commercial Banking at FMB. It appears from those records that the Debtors signed and gave to Strategic a Permission to Release Information form on January 4, 2016. On January 6, 2016, apparently following a telephone conversation between them, Sieradzky faxed or emailed to Henk a copy of the Release, requesting a copy of the operating note and information concerning the status of the Debtors' loans with FMB. Later that same day, Henk emailed to Sieradzky a copy of the operating note with information about the payment amounts and confirming that the payments on the loans were current. No documents were sent to

Henk by Sieradzky and no information was provided to her concerning the nature or terms of Strategic's financing. There is no evidence that Ms. Henk had any other communication with anyone from Strategic and she did not testify.

Mr. Wolfson, Strategic's only witness at trial, never spoke with Mr. Stonecipher or anyone else at FMB. Rather, Mr. Wolfson testified as to Strategic's normal investigative process and its evaluation of potential customers. The bulk of Strategic's business is providing financing to small businesses, most often in the $20,000 to $40,000 range, with a "factoring" arrangement whereby Strategic purchases the customer's future receivables and receives periodic payments by debiting the account in which the collections are deposited in a fixed amount. Mr. Wolfson explained that for transactions exceeding $100,000, such as the Debtors', a member of Strategic's special accounts team would check with the references listed by the merchant as it was important for Strategic to know that there were no problems between the merchant and his bank. The underwriter would typically explain the nature of Strategic's business and the type of financing involved. Mr. Wolfson played no role in the investigation of Anthony's financial circumstances, his relationship with FMB or the evaluation of his creditworthiness. Mr. Wolfson conceded that Strategic has no meaningful experience providing funding to farmers or agricultural businesses. After admitting that Strategic was aware of FMB's perfected security interest in crops before the Strategic financing was funded, having obtained a UCC search, Mr. Wolfson stated his opinion that lien priority was not necessarily controlling since Strategic was purchasing the receivables.

The two pages of Strategic's file notes introduced into evidence indicate that the Debtors' application for financing was received by Strategic in late December 2015 from a referring entity called Feumach Air Airgead, Ltd. The notes reference that a single communication between Strategic employee Lee Sieradzky and Mr. Stonecipher took place, on January 7, 2016. Mr. Sieradzky's notation states, in full: "Confirmed mortgage with bank (adam stonecipher) that they are current and have no late payments. They have two operating notes and a notes (sic) payable for their property, all of which are current." Mr. Sieradzky did not testify at trial. There is no indication in Strategic's records that Mr. Stonecipher was advised by Mr. Sieradzky, or anyone else, that Strategic was purchasing the Debtors' future business receipts or that Strategic would be regularly debiting the operating account at FMB.

Mr. Stonecipher's lack of knowledge of Strategic's terms is corroborated by a Loan Committee Presentation that he prepared as of February 17, 2016, summarizing the history of the Debtors' farming operation and the status of their loans with FMB, and recommending the terms for restructuring the Debtors' substantial indebtedness. The Presentation is a 20-page comprehensive work-up that analyzes FMB's credit risk, itemizes the Bank's collateral and expected sources of payment, the Debtors' anticipated cash flow and plan for liquidating collateral to pay down the Bank's balance. It describes the Bank's lien on all grain, including the remaining 2015 crops in storage and the 2016 crops to be planted. Included in the "Special Conditions" section is the condition that "FMB will require joint grain checks from grain buyers," meaning FMB will be named as a joint payee on all grain checks to ensure control over the proceeds that were its collateral. Nowhere in the Presentation is there any mention of Strategic or another lender acquiring an interest in FMB's collateral. The Presentation is highly persuasive evidence that Mr. Stonecipher was unaware of the Strategic Factoring Agreement and purchase of farm receipts when he prepared it in February 2016.

Mr. Stonecipher's lack of knowledge as to the existence and nature of the Strategic Factoring Agreement at and around the time the transaction occurred is also corroborated by his subsequent communication with Mr. Slaton several months later. In an in-house email from Slaton to Stonecipher on April 12, 2020, referred to above, concerning the weekly ACH debit, Stonecipher responded that he did not know what the Strategic debit was regarding, but would inquire of Mr. Brooks. Later that day, Stonecipher sent an email to Amy Brooks stating "I noticed a transaction coming through your account for $4543 to Strategic Farm Marketing. What would that be for, and is it something I need to cover from the LOC?" He testified that Amy did not respond to his inquiry. In the absence of evidence that Mr. Stonecipher was made aware of the Debtors' sale of the farm receivables to Strategic, its position that FMB, by "encouraging" the Debtors to find an alternative lender to fund the 2016 inputs, impliedly consented to waiver of its lien is entirely untenable.

Despite a UCC-1 search disclosing that FMB held a properly perfected security interest in nearly all the Debtors' property, Strategic's inquiry to FMB was quite limited. In this Court's view, Strategic, perhaps relying on the rosy picture of the Debtors' farming operation painted by Anthony in his interview with Mr. Sieradzky, which noted that Debtors were looking to expand their operation and that their "$3M operating line" would be renewed "in the next month or

two," was willing to assume the risk that the periodic payments called for by the Factoring Agreement would be made over the relatively short 1-year repayment period. Strategic may also have placed excessive reliance on the belief that "purchasing" a borrower's receipts would automatically enable it to trump a prior perfected security interest in the same property.

In the pretrial statement filed in March 2020, Strategic relied on *In re Pearson*, 142 B.R. 831 (Bankr. C.D. Ill. 1992) and *Metropolitan Life Ins. Co. v. American Nat. Bank and Trust Co.*, 288 Ill.App.3d 760 (1997), contending that a lienholder who authorizes the sale of property in which it has a security interest waives the lien on the collateral. Those decisions, properly decided under section 9-306(2) of Article 9, repealed and replaced by section 9-315, as explained above, are no longer relevant. In any event, there is no evidence that FMB authorized Anthony to sell any property to Strategic.

In closing argument, Strategic posited that FMB's only interest was in the "proceeds" of the account receivables that Strategic purchased in January 2016, being the $173,795 deposited in the Debtors' operating account. FMB did not follow Strategic's argument, and it eludes the Court as well. Comment 2 to section 9-315, Continuation of Security Interest or Agricultural Lien Following Disposition of Collateral, provides:

> Subsection (a)(1), which derives from former Section 9-306(a), contains the general rule that a security interest survives disposition of the collateral. In these cases, the secured party may repossess the collateral from the transferee or, in an appropriate case, maintain an action for conversion. The secured party may claim both any proceeds and the original collateral, but, of course, may have only one satisfaction.

Even if Strategic's theory that it purchased the Debtors' business receipts is valid, an issue this Court does not have to decide, FMB did not lose its interest in the crops ultimately sold to grain buyers or in the cash proceeds paid by those purchasers.

In conclusion, Strategic's theory of an implied waiver of FMB's lien boils down to the question of what did Adam Stonecipher know about Strategic's financing and when did he know it. The evidence is conclusive that he was not provided a copy of the Factoring Agreement and no one told him that Strategic was purchasing the Debtors' farm receipts. Strategic could have easily faxed or emailed a copy of the Factoring Agreement to FMB or, more proactively, could have asked FMB for a written waiver of its lien rights or a subordination agreement. It chose not to do so. The evidence compels the conclusion that at no time during the relevant time frame from December 2015 through at least April 2016 was Mr. Stonecipher aware that the Debtors

had sold farm receipts. At no time did he form an intent to waive or subordinate FMB's lien rights in favor of Strategic's interest. Since FMB did not authorize the sale of the Debtors' future farm receivables free and clear of its security interest, its security interest continues in the remaining grain proceeds held by the Debtors, pursuant to U.C.C. section 9-315.

**<u>Equitable Subordination</u>**

The Court turns to Strategic's alternative argument that FMB's security interest should be equitably subordinated under section 510(c) of the Bankruptcy Code. As this Court previously noted in this case, equitable subordination, a bankruptcy-specific remedy, is adjudicated strictly as a matter of federal law. *See Redmond v. Jenkins (In re Alternate Fuels, Inc.),* 789 F.3d 1139, 1154 (10th Cir. 2015); *In re Lifschultz Fast Freight,* 132 F.3d 339, 344 (7th Cir. 1997). Equitable subordination under section 501(c)(1) requires three conditions: (1) the creditor engaged in some type of inequitable conduct, (2) the misconduct resulted in injury to or gave the creditor some unfair advantage over another creditor, and (3) the remedy of subordination must not be inconsistent with provisions of the Bankruptcy Code. *In re Kreisler*, 546 F.3d 863, 866 (7th Cir. 2008). The remedy is most frequently used against corporate insiders who have attempted to convert an equity interest into secured debt in anticipation of bankruptcy. *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting,* 908 F.2d 1351, 1356 (7th Cir. 1990). Proving for purposes of Section 510(c) that a non-insider creditor behaved inequitably in anticipation of the debtor's bankruptcy is a much higher bar, such as that the creditor's inequitable behavior was "egregious and conscience-shocking." *In re Sentinel Management Group, Inc.,* 728 F.3d 660, 669-70 (7th Cir. 2013).

Strategic contends that FMB was an insider of the Debtors by virtue of a relationship of control between FMB and the Debtors, as evidenced by FMB's actions to force the Debtors to adhere to budgeted expenses, resulting in disapproval of certain off-budget expenses. In characterizing the Debtors' operating account as a "control account," Strategic disregards one of the terms and conditions to FMB's restructuring of the Debtors' loans that Anthony was required to submit copies of receipts and bills for bank controlled draws from the 2016 line of credit, to reconcile with Debtors' cash flow and expense projections. Strategic's contention is based on an in-house email from Diane Garrett, a commercial loan officer with FMB, to Stonecipher, dated

August 2, 2016, advising him that items totaling $15,808.69 were being returned, including a check for $11,184.69 to Herr Petroleum, $81.00 to Warren Henderson Farm Bureau and a debit for $4,543, which had a stop payment on it, that turned out to be Strategic's ACH debit. Mr. Stonecipher directed her not to pay the one with the stop payment but to go ahead and pay the other two. He explained at trial that either Anthony or Amy would telephone or email and advise him of any expenses that needed to be paid. He testified that when checks were presented that would result in an overdraft status, the expenses would be reviewed against the budget submitted by the Debtors and if they were not specifically requested, they would not be allowed. The direction to pay the two budgeted expenses was consistent with the established procedure put in place when the loans were restructured. The decision not to pay an ACH debit because of a stop payment order was, according to the evidence, a standard bank policy that was entirely unrelated to the budget adherence requirement imposed on the Debtors.

Strategic's portrayal of FMB as controlling the farming operations was not borne out by the evidence. FMB, pursuant to its loan agreement, had the right to require Debtors to comply with procedures for advancement of funds. As stated in the Loan Committee Presentation referred to above, "FMB will require copies of receipts/bills for bank controlled draws from 2016 LOC [line of credit] to reconcile with 2016 CFP [cash flow projections]." FMB was not directing the Debtors as to what expenses to incur. Rather, it was only requiring the Debtors to adhere to a budget of projected expenses they prepared, and to justify deviations therefrom on an item by item basis. The loan restrictions at issue here, while favorable to FMB by enabling it to better monitor the expenditure of money drawn on the operating line of credit, are not atypical of those insisted on by lenders faced with distressed loans and do not render FMB an insider. *See In re Radnor Holdings Corp.*, 353 B. R. 820, 840-41 (Bankr. D. Del. 2006). Anthony himself may not have been pleased with the cash flow discipline imposed by FMB's requirements, but he understood the rationale for and accepted those conditions. Moreover, the account statements indicate that payment of all of the Debtors' budgeted expenses were routinely approved by FMB.

Strategic's chief allegation of inequitable conduct centers around its contention that FMB unilaterally issued the Stop Payment order in August 2016. The evidence regarding this issue is less than clear and, ultimately, not persuasive that FMB did what it is accused of. Anthony denied either signing a stop payment directive, which he claims Mr. Stonecipher may have left with him during a home visit, or making an oral request to FMB that the ACH debits be

terminated, although he conceded having significant memory lapses while rehabilitating from his injuries. Mr. Stonecipher testified that neither he nor any other personnel at FMB could have initiated the Stop Payment order without authorization from one of the Debtors. He testified frankly that he was not concerned with whether Strategic got paid or not.

The evidence supports Mr. Stonecipher's assertion that FMB could not have been attempting to keep Strategic from getting paid. The ACH debits that were processed up until August 2016 totaled more than $94,000 in payments to Strategic. After the Stop Payment order, the record shows that a number of additional payments, totaling $17,000, were made to Strategic from November 30, 2016 to September 2017, by wire transfer. Anthony testified that the only wire transfers he made were transfers of funds from one of his accounts at FMB, with its knowledge and assistance. If FMB unilaterally imposed the Stop Payment order to see that Strategic was paid nothing more, why would it have permitted further payments by wire transfer? There is no evidence that Anthony or Amy Brooks ever questioned FMB as to why the ACH debits had been stopped or requested that they be reinstated. The Court concludes as more likely than not that the Debtors, or one of them, made the request to FMB to stop the weekly ACH debits to Strategic so they could avoid overdrafts and better control their cash availability to pay other bills. The Debtors then continued to pay Strategic by wire transfer when funds were available, which FMB did not oppose and actually assisted with.

This Court concludes that Strategic failed to show any misconduct on behalf of FMB, a non-insider creditor, let alone inequitable misconduct of an egregious nature which would warrant equitable subordination of its claim. A lender has the right to protect its own interests; it is not required to put the interests of its customers and the customers' other creditors first. *Kham & Nate's Shoes No. 2*, 908 F.2d at 1358. Though Strategic may have been out of its league making a farm input loan premised, in large part, on the purchase of proceeds from crops to be planted, harvested and sold well into the future, while requiring weekly debt service payments to begin immediately, it is a sophisticated business and could have structured the transaction to ensure its interests in the farm receivables were free and clear of FMB's security interest. By failing to do so, it has no one to blame but itself.

For the foregoing reasons, the Court concludes that Strategic has failed to carry its burden of proof and FMB is entitled to entry of judgment in its favor. This Opinion constitutes this

Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure. A separate judgment order will be entered.

# # #